**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

|                                         |     |                              |
|-----------------------------------------|-----|------------------------------|
| HERMENIA ROSE,                          | )   |                              |
|                                         | )   |                              |
| **Plaintiff,**                          | )   |                              |
|                                         | )   |                              |
|                                         | )   |                              |
| **v.**                                  | )   | **CIVIL NO. 3:11-cv-701-JRS** |
|                                         | )   |                              |
| MICHAEL J. ASTRUE,                      | )   |                              |
| **Commissioner of Social Security,**    | )   |                              |
|                                         | )   |                              |
| **Defendant.**                          | )   |                              |

## REPORT AND RECOMMENDATION

Hermenia Rose ("Plaintiff") last worked as a kitchen/cafeteria worker in 2003. She alleges that she suffers from mental illness and sarcoidosis.[1] On August 25, 2009, Plaintiff applied for Supplemental Security Income ("SSI") with a disability onset date of February 1, 2004 — later amended to August 25, 2009 — under the Social Security Act (the "Act"). Plaintiff's claim was presented to an administrative law judge ("ALJ"), who denied Plaintiff's request for benefits. The Appeals Council subsequently denied Plaintiff's request for review on September 14, 2011.

Plaintiff now challenges the ALJ's denial of SSI benefits, asserting that the ALJ improperly weighed the opinions of Plaintiff's doctors, improperly evaluated Plaintiff's credibility and presented the vocational expert ("VE") with an incomplete hypothetical question.

---

[1] Sarcoidosis is "a chronic, progressive, systemic granulomatous reticulosis of unknown etiology, characterized by hard tuvercles" that can occur in the organs or tissue. *Dorland's Illustrated Medical Dictionary* 1668 (Ed. 32 2011).

(Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 10-20.) In his decision, the ALJ

determined that Plaintiff had the RFC to perform light work, except that:

> She should never climb ropes, ladders or scaffolding. She could occasionally
> balance, crawl, crouch, kneel and crawl [sic]. Use of the hands for reaching,
> grasping and handling should be no more than frequent a [sic] level. She must
> avoid hazards, such as hazardous machinery and unprotected heights. Due to her
> mental impairments, she could perform unskilled work, using the phrases that are
> commonly understood in jobs that involve simple routine tasks with short simple
> instructions, performing work that needs little or no judgment to do simple duties
> that can be learned on the job in a short timeframe; making only simple work-
> related decisions with few workplace changes. She should have no direct face-to-
> face interaction with the general public. She should do no job that would require
> changing job locations during the course of the day, that is, the job is performed at
> the same general physical location each day and does not require transit to a
> different job location course during the workday. She should have no direct face-
> to-face interaction with coworkers on the completion of an assigned task or duty,
> but this would not preclude routine daily face-to-face interaction on the job site.
> She should do no job that demands or requires more than occasional level direct
> face-to-face interaction with supervisors.

(R. at 21.) In doing so, the ALJ assigned great weight to the non-treating state agency medical

consultants, persuasive weight to a consulting psychiatrist and little weight to Plaintiff's treating

psychiatrist. (R. at 24.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. §

405(g). The parties have submitted cross-motions for summary judgment, which are now ripe

for review.[2] Having reviewed the parties' submissions and the entire record in this case, the

Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. §

636(b)(1)(B). For the reasons that follow, it is the Court's recommendation that Plaintiff's

---

[2] The administrative record in this case has been filed under seal, pursuant to E.D. Va.
Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any
personal identifiers such as Plaintiff's social security number, the names of any minor children,
dates of birth (except for year of birth), and any financial account numbers from its consideration
of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information
to only the extent necessary to properly analyze the case.

motion for summary judgment and motion for remand (ECF Nos. 6 & 7) be DENIED; that

Defendant's motion for summary judgment (ECF No. 9) be GRANTED; and that the final

decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff complains that the ALJ erred when he assigned weight to the opinions

of her doctors, when he assessed her credibility and when he relied on the "flawed" testimony of

the VE, Plaintiff's medical history, the opinions of Plaintiff's physicians, Plaintiff's testimony as

well as the testimony of the VE are summarized below.

**A.     Plaintiff's Work History**

Plaintiff completed the eleventh grade and was 30 years old at the time that she filed her

claim. (R. at 185, 33, 141.) While Plaintiff has no past relevant work, she worked as a

kitchen/cafeteria worker in 2003. (*See* R. at 25, 50, 180.)

**B.     Plaintiff's Medical Records**

A few months before Plaintiff filed her claim, she visited Ramesh Koduri, M.D., a

psychiatrist, and complained that she was tired, frustrated, agitated, irritated and impatient, but

that her Zyprexa was "helpful." (R. at 636.) On September 8, 2009, Plaintiff stated that she was

having trouble falling asleep, feared her husband was cheating and was angry. (R. at 362.) Dr.

Koduri diagnosed Plaintiff with depression and a history of sarcoidosis; Plaintiff was prescribed

Celexa, Wellbutrin and Ativan. (R. at 362.)

On January 15, 2010, Plaintiff told Dr. Koduri that she was feeling better and had applied

for disability. (R. at 389.) Plaintiff's medications included Celexa, Ativan and Trazodone. (R.

at 389.) Three months later, Plaintiff complained about her relationship with her husband and

other stresses in her life. (R. at 515.) On June 9, 2010, Plaintiff did not attend her meeting with

3

Dr. Koduri. (R. at 514.) Two weeks later, Plaintiff reported difficulty sleeping and continued to complain about her family as well as her husband. (R. at 513.)

On July 12, 2010, Plaintiff visited Steven N. Spence, M.D., for a follow-up. (R. at 419-25.) Dr. Spence recorded Plaintiff's diagnosis of pulmonary sarcoid and noted that Plaintiff had not been taking prednisone "for months." (R. at 420.) He opined that Plaintiff was developing arthritis as a result of her sarcoid. (R. at 420.) Dr. Spence also indicated that Plaintiff's mood, affect, behavior, judgment and thought content were normal. (R. at 421.) He prescribed prednisone for Plaintiff. (R. at 421.)

A month later, Plaintiff visited Dr. Koduri after she asked her husband to leave the house and for a separation. (R. at 512.) On September 9, 2010, Plaintiff failed to show up to her appointment with Dr. Koduri. (R. at 511.) A few weeks later, Plaintiff talked with Dr. Koduri after she ran out of medication. (R. at 510.) On November 16, 2010 and February 18, 2011, Plaintiff did not show up to her scheduled appointment with Dr. Koduri. (R. at 508-09.) After a nearly six-month absence, Plaintiff visited Dr. Koduri again on March 7, 2011. (R. at 507.) Plaintiff reported that she was sleeping poorly and discussed her difficult relationships with her father and husband. (R. at 507.)

On March 16, 2011, Plaintiff visited the emergency room complaining of abdominal pain scaled as an eight out of ten. (R. at 545-56.) Plaintiff was given a prescription for Tylenol with Codeine. (R. at 548.) On March 28, 2011, Plaintiff visited Dr. Koduri, who recommended that she undergo psychotherapy. (R. at 506.) Plaintiff complained of the stresses of family life, including her husband and children. (R. at 506.) Plaintiff failed to show up to her appointment with Dr. Koduri on April 11, 2011. (R. at 505.)

4

On April 13, 2011, Plaintiff visited the emergency room complaining of constant back spasms with a pain maxed at ten out of ten. (R. at 540-44.) Plaintiff also indicated that lortab helped her pain and that she had run out of flexeril. (R. at 541.) Plaintiff was prescribed lortab and flexeril. (R. at 542.) On April 20, 2011, Plaintiff visited Dr. Koduri after she ran out of Trazodone. (R. at 504.) Plaintiff indicated that her sleep and appetite were poor. (R. at 504.)

On May 7, 2011, Plaintiff visited the emergency room complaining of losing her balance, feeling anxious for her upcoming disability hearing and having trouble thinking and concentrating. (R. at 530-36.) When asked for a urine sample, Plaintiff answered "with attitude" that she was "not here for [her] urine to be checked," but rather "for some pain medicine." (R. at 532.) Plaintiff's urine was positive for cannabinoids, phencyclidine, barbiturates, benzodiazepines, cocaine, opiates, methadone, tricyclics and amphetamines. (R. at 534.) Plaintiff requested hydrocodone from the hospital but was denied narcotics, because Plaintiff had received two prescriptions for narcotics from the emergency room over the previous two months. (R. at 535.)

## C.  The Opinion of Dr. Koduri, Plaintiff's Treating Psychiatrist

On August 16, 2010, Dr. Koduri filled out a Medical Evaluation form. (R. at 404-05.) Dr. Koduri marked that Plaintiff was unable to participate in employment in any capacity for more than 60 days due to psychiatric limitations. (R. at 404-05.) Plaintiff was diagnosed with major depression recurrent with episodic psychosis, but was still determined to be able to care for her children. (R. at 405.)

On April 27, 2011, Dr. Koduri completed a Psychiatric/Psychological Impairment Questionnaire and diagnosed Plaintiff with major depression and anxiety disorder. (R. at 494-501.) Dr. Koduri indicated that Plaintiff's first day of treatment was November 17, 2008, and

5

that Plaintiff had been making "variable" visits to Dr. Koduri. (R. at 494.)  Dr. Koduri opined

that Plaintiff's prognosis was limited, but she was "able to stay out of the hospital" and she had

no self-destructive thoughts or behavior. (R. at 494.)  Dr. Koduri assigned Plaintiff a GAF score

between 45 and 50.[3]  (R. at 494.)

Dr. Koduri indicated that Plaintiff had issues with her appetite, sleep, mood, social

withdrawal, trust, feelings of guilt, anxiety, irritability towards her family and thinking. (R. at

495.)  Plaintiff had visited the emergency room for pain and muscle spasms. (R. at 496.)  Dr.

Koduri did not make marks for all abilities and noted many times that Plaintiff had not worked

since 2003. (R. at 497-99.)  Dr. Koduri opined that Plaintiff's anxiety caused her extreme pain

and that Plaintiff had more bad days than good days. (R. at 500.)  Plaintiff could tolerate a low

stress job, but had not worked since 2003 and had difficulty at home with her children. (R. at

500.)

**D.     The Opinion of Dr. Brown, a Consulting Pyschologist**

On November 26, 2009, Plaintiff met with Demetria Brown, Psy.D., for a consultation

examination. (R. at 375-83.)  Throughout the interview, Plaintiff was cooperative, made

constant eye contact and did not have any problems with self-expression. (R. at 379.)  Plaintiff

appeared to be of average intelligence and could complete her interview without a break. (R. at

380, 377.)  Plaintiff discussed her panic attacks and admitted to having suicidal thoughts without

a suicide plan. (R. at 379-80.)

---

[3] The Global Assessment of Functioning ("GAF") is a 100-point scale that rates
"psychological, social, and occupational functioning." *Diagnostic Statistical Manual of Mental
Disorders*, Americ. Psych. Assoc., 32 (4th Ed. 2002) (hereinafter "*DSM-IV*").  A GAF of 50 is
defined as "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent
shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no
friends, unable to keep a job)." *Id.* at 34.

Dr. Brown diagnosed Plaintiff with generalized anxiety disorder and assigned Plaintiff a GAF of 51. (R. at 381.) Dr. Brown indicated that Plaintiff's prognosis was poor, because she had internalized her sarcoidosis diagnosis as being a death sentence. (R. at 382.) She opined that without intervention, Plaintiff's prognosis would become progressively worse. (R. at 382.)

Further, Dr. Brown opined that Plaintiff could perform simple, complex and repetitive tasks on a consistent basis. (R. at 382.) However, because of her fear of new places and anxiety, Dr. Brown opined that Plaintiff may not be able to attend work on a regular basis. Additionally, Plaintiff may have decreased stamina and concentration from her lack of sleep as well as her lack of appetite. (R. at 382.) Dr. Brown indicated that Plaintiff would not need additional supervision or difficulty in interacting with supervisors. (R. at 383.) Finally, Dr. Brown opined that Plaintiff would likely experience difficulty with stresses from a competitive work environment. (R. at 383.)

**E.    The Opinions of the Non-treating State Agency Psychologists**

On December 4, 2009, Stephen Saxby, Ph.D., completed a Mental RFC Assessment. (R. at 65-66.) Dr. Saxby indicated that Plaintiff had marked limitation in her ability to understand and remember detailed instructions, carry out detailed instructions and interact appropriately with the general public. (R. at 65-66.) On April 16, 2010, Alan D. Entin, Ph.D. completed a Mental RFC Assessment and agreed with Dr. Saxby. (*See* R. at 79-80.)

**F.    Plaintiff's Testimony**

On September 5, 2009, Plaintiff completed a function report detailing her activities of daily living (ADLs). (R. at 200-07.) Plaintiff would get her children ready for school, help her children with their homework, clean the house, wash dishes, launder clothes, prepare meals,

socialize with her sister and shop.  (R. at 200-07.)  Plaintiff had little desire to care for her

personal needs and indicated that she was fearful of leaving her house.  (R. at 201, 203.)

At the hearing, Plaintiff testified that she visited Dr. Koduri every three weeks for her

severe depression.  (R. at 39.)  She stated that she was very emotional and often isolated herself.

(R. at 40.)  Plaintiff testified that she reconciled with her husband a few days before the hearing

and had been separated from him for at least one year before their reconciliation.  (R. at 41.)  She

explained that she helped her children with school and that they helped her with the laundry.  (R.

at 42.)  Plaintiff testified that she heard voices.  (R. at 43.)  Her last job was as a kitchen worker

in a cafeteria in 2003.  (R. at 44-45.)

## G.    The VE's Testimony

At the hearing, Tricia A. Burser testified as a vocational expert ("VE").  (R. at 49.)  The

ALJ asked the VE to assume that Plaintiff had an RFC of:

> A light exertional work; never climb ropes, ladders, scaffolding, remaining
> posture will be occasional; must avoid hazards such as hazardous machinery,
> unprotected heights; unskilled work, and as the phrase is commonly understood,
> jobs that involve simple, routine tasks; short simple instructions; work that needs
> little or no judgment to do; simple duties that can be learned on the job in a short
> time-frame; only simple work-related decisions with few workplace changes; no
> direct, face-to-face interaction with the general public; no more than an occasional
> level face-to-face interaction with coworkers on the completion of an assigned
> task or duty, but this would not preclude routine face-to-face interaction on the
> job site; no job that demands or requires close supervision; no job that would
> require changing job locations during the course of the day, that is, the job is
> performed at the same general physical location each day and does not require
> transit to a different job location during the course of the workday.

(R. at 53.)  Continuing, the ALJ asked the VE to assume "an individual the same age,

educational background, same work history as" Plaintiff and answer whether there were any

unskilled occupations available in the national economy.  (R. at 52.)

In response, the VE answered that the hypothetical individual could perform the jobs of a maker, laundry folder or garment sorter. (R. at 52.) The ALJ then changed the RFC "to indicate no more than a frequent level use of the hands for reaching/grasping/handling," and the VE responded that the positions of laundry folder or garment sorter were still available. (R. at 52.) At a "light level that would incorporate the no more than frequent level use of the hands for reaching/grasping," a hypothetical individual could perform the job of a hotel housekeeper. (R. at 53.)

> The ALJ then slightly changed the RFC
>
> to indicate no direct face-to-face interaction with coworkers on the completion of assigned task or duty, but this would not preclude routine daily face-to-face interaction on the job site, and no job that demands or requires more than an occasional level of direct face-to-face interaction with supervisors.

(R. at 53.) The VE answered that jobs were still available. (R. at 53.) At the sedentary level work with the requirements mentioned by the ALJ — including the limitation of face-to-face interaction — the VE indicated that the positions of charge account clerk, ink printer and lens inserter were available. (R. at 53-54.)

## II. PROCEDURAL HISTORY

Plaintiff filed for SSI on August 25, 2009, claiming disability due to her mental impairments and sarcoidosis with an alleged onset date of February 1, 2004, which was later amended to August 25, 2009. (R. at 33-34, 57, 141, 187.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[4] (R. at 57-89, 93-95.) On May 12, 2011, Plaintiff testified before an ALJ. (R. at 17.) On June 10, 2011, the ALJ issued a

---

[4] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

decision finding that Plaintiff was not disabled. (R. at 17-26.) The Appeals Council subsequently denied Plaintiff's request to review the ALJ's decision on September 14, 2011, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (*See* R. at 1-3.)

### III. QUESTIONS PRESENTED

Was the Commissioner's rejection of the opinions of Plaintiff's treating physicians supported by substantial evidence on the record and the application of the correct legal standard?

Was the Commissioner's evaluation of Plaintiff's credibility supported by substantial evidence on the record and the application of the correct legal standard?

Was the Commissioner's hypothetical questions posed to the VE supported by the record?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472

(citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[5] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the

---

[5] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks

analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[6] based on an assessment of the claimant's residual functional capacity ("RFC")[7] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work

---

or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[6] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[7] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since August 25, 2009. (R. at 19.) At step two, the ALJ determined that Plaintiff was severely impaired from obesity, sarcoidosis, depression and generalized anxiety disorder. (R. at 19.) At

step three, the ALJ concluded that Plaintiff's maladies did not meet one of the listed impairments

in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 19-21.)

The ALJ then determined that Plaintiff had the RFC to perform light work, except that:

> She should never climb ropes, ladders or scaffolding. She could occasionally balance, crawl, crouch, kneel and crawl [sic]. Use of the hands for reaching, grasping and handling should be no more than frequent a [sic] level. She must avoid hazards, such as hazardous machinery and unprotected heights. Due to her mental impairments, she could perform unskilled work, using the phrases that are commonly understood in jobs that involve simple routine tasks with short simple instructions, performing work that needs little or no judgment to do simple duties that can be learned on the job in a short timeframe; making only simple work-related decisions with few workplace changes. She should have no direct face-to-face interaction with the general public. She should do no job that would require changing job locations during the course of the day, that is, the job is performed at the same general physical location each day and does not require transit to a different job location course during the workday. She should have no direct face-to-face interaction with coworkers on the completion of an assigned task or duty, but this would not preclude routine daily face-to-face interaction on the job site. She should do no job that demands or requires more than occasional level direct face-to-face interaction with supervisors.

(R. at 21.)

The ALJ noted that Plaintiff had pain rated a nine or a ten that radiated down her legs and

she took prescription pain medication. (R. at 21-22.) Plaintiff visited a psychiatrist every three

weeks for severe depression, as she frequently cried, became angry and isolated herself. (R. at

22.) The ALJ noted that Plaintiff testified that she spent her days watching television or crying

and generally could not leave her house 27 days out of the month. (R. at 22.) Plaintiff testified

that she could walk one-half of a block, could stand for five minutes before needing to sit and

could lift a half-gallon of milk. (R. at 22.)

Plaintiff lived with her eleven and twelve-year-old sons and cared for her children by

taking them to the school bus, fixing their meals, helping them with their homework and

gathering their clothes for school. (R. at 21-22.) The ALJ further noted that Plaintiff had

14

previously reconciled with her husband after having been separated for at least a year. (R. at 22.) The ALJ determined that, while Plaintiff's impairments could cause her alleged symptoms, Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not fully credible. (R. at 22.)

The ALJ then summarized Plaintiff's medical history, which included a probable diagnosis of sarcoidosis. (R. at 22.) Plaintiff smoked half a pack of cigarettes a day, weighed 191 pounds at 5'3" tall and was non-compliant with her medication treatment. (R. at 22.) The ALJ noted that Plaintiff had diffuse arthritis with no history of rheumatoid arthritis. (R. at 22.) The ALJ recognized that Dr. Spence opined that Plaintiff was developing arthritis from her sarcoidosis. (R. at 22.)

Continuing, the ALJ summarized Plaintiff's mental records, which indicated that Plaintiff was well-oriented in no distress with normal mood and affect. (R. at 22.) The ALJ also noted that Plaintiff complained of pain rated a nine out of ten, although she was not in any apparent distress, and that Plaintiff requested prescription narcotics from the emergency room on many occassions. (R. at 23.) Plaintiff also missed many appointments with Dr. Koduri, Plaintiff's psychiatrist. (R. at 23.)

Dr. Koduri opined that Plaintiff was markedly limited in her ability to perform activities and could tolerate low work stress. (R. at 23.) Plaintiff had a consultation with Dr. Brown, who diagnosed Plaintiff with generalized anxiety disorder and a poor prognosis, but opined that Plaintiff could overcome her prognosis with intensive intervention. (R. at 23-24.)

The ALJ assigned great weight to the non-treating state agency medical consultants, who opined that Plaintiff was able to perform light work with some mental limitations. (R. at 24.) Persuasive weight was assigned to Plaintiff's consultative examiner, Dr. Brown. (R. at 24.)

Finally, the ALJ afforded little weight to Dr. Koduri's opinions, as they were inconsistent with the treatment notes. (R. at 24.)

At step four, the ALJ assessed that Plaintiff had no past relevant work. (R. at 25.) Next, considering Plaintiff's age, limited education, ability to speak English, work experience and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. at 25.) More specifically, the ALJ determined that, based on the testimony of the VE, Plaintiff could perform the positions of a marker, laundry folder, garment sorter, hotel housekeeper, charge account clerk, ink printer or lens inserter. (R. at 25-26.) The ALJ therefore found that Plaintiff had not been under a disability under the Act from August 25, 2009. (R. at 26.)

Plaintiff complains that the ALJ did not assign her treating psychiatrist controlling weight and did not properly explain his assignments of weight. (Pl.'s Mem. at 10-14.) Next, Plaintiff asserts that substantial evidence did not support the ALJ's credibility determination and that the ALJ did not properly explain his evaluation. (Pl.'s Mem. at 15-19.) Finally, Plaintiff argues that the VE's testimony was based upon a hypothetical that did not properly convey her mental limitations. (Pl.'s Mem. at 19-20.) In contrast, the Commissioner asserts that substantial evidence supported the ALJ's decisions. (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 11-23.)

## A.   Substantial evidence supported the ALJ's assignment of weight to the medical opinions.

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluation that have been ordered. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physicians, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if: (1) it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques; and, (2) is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. *Jarrells v. Barnhart*, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); *see also* 20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

While the ALJ must generally give more weight to a treating physician's opinion, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig*, 76 F.3d at 590 (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). Since its decision in *Hunter*, the Fourth Circuit has consistently held that, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other

substantial evidence, it should be accorded significantly less weight." *Mastro*, 270 F.3d at 178 (citing *Craig*, 76 F.3d at 590); *see also* 20 C.F.R. § 416.927(d)(2).

If a medical opinion is not assigned controlling weight by the ALJ, then the ALJ assesses the weight of the opinion by considering: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area which an opinion is rendered; and (6) other factors brought to the Commissioner's attention which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006).

Plaintiff complains that the ALJ did not adequately explain his assignment of little weight to Dr. Koduri's opinion and directs the Court to *DeLoatche v. Heckler*, 715 F.2d 148 (4th Cir. 1983), and *Hammond v. Heckler*, 765 F.2d 424 (4th Cir. 1985). (Pl.'s Mem. at 11-12.) Continuing, she argues that Dr. Koduri's opinion was supported by substantial evidence in the record. (Pl.'s Mem. at 12.) Finally, Plaintiff takes umbrage with the ALJ's assignment of great weight to the non-treating state agency doctors. (Pl.'s Mem. at 12-14.)

The ALJ properly formulated and explained his decision under the guidelines of the Fourth Circuit. In *DeLoatche*, 715 F.2d at 150, the Fourth Circuit held that an ALJ "must present [the court] with findings and determinations sufficiently articulated to permit meaningful judicial review." Continuing, the ALJ must "refer specifically to the evidence informing the [his] conclusion." *Hammond*, 765 F.2d at 426.

In assigning Dr. Koduri's opinion little weight, the ALJ properly explained his decision. First, the ALJ summarized Plaintiff's mental records, which indicated that Plaintiff was well-oriented and in no distress with normal mood and affect. (R. at 22.) He also noted that Plaintiff missed many appointments with Dr. Koduri. (R. at 23.) Further, the ALJ summarized Dr. Koduri's opinions that Plaintiff was markedly limited in her ability to perform activities, but could tolerate low work stress. (R. at 23.) He then assigned Dr. Koduri's opinions little weight, as they were inconsistent with Plaintiff's treatment notes. (R. at 24.)

Not only did the ALJ properly explain his assignment of weight to Dr. Koduri's opinions, but substantial evidence also supported his assignment, because Dr. Koduri's opinions were inconsistent with the treatment notes — a key factor under *Craig* to obtain controlling weight. Plaintiff did not attend at least five visits with Dr. Koduri and had a six-month absence from attending sessions with Dr. Koduri. (R. at 505, 507-10, 511, 514.) When she visited Dr. Koduri, Plaintiff generally complained of her life stressors and relationship with her husband — subjective complaints — and Dr. Koduri's notes tended to summarize Plaintiff's complaints without discussing any objective analysis. (*See* R. at 362, 389, 504, 506-07, 510, 512-13, 515, 636.) Nowhere in the treatment notes or Dr. Koduri's opinion were there any discussions of Plaintiff's alleged delusions or hallucinations. (*See* R. 362, 389, 495, 504, 506-07, 510, 512-13, 515, 636.) Therefore, Dr. Koduri's August 16, 2010 assessment of Plaintiff's major depression recurrent with episodic psychosis was not supported by the treatment notes.

Additionally, Dr. Koduri did not make marks for all abilities in the April 27, 2011 opinion. (R. at 497-99.) Dr. Koduri diagnosed Plaintiff with major depression as well as anxiety disorder and opined that Plaintiff's prognosis was limited. (R. at 494.) Additionally, Dr. Koduri

indicated that Plaintiff was "able to stay out of the hospital." (R. at 494.) Plaintiff could tolerate a low stress job and had difficulty at home with her children. (R. at 500.)

Dr. Koduri also assigned Plaintiff a GAF score between 45 and 50. (R. at 494.) "A 41-50 reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupational functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006). There was, however, no support for such a GAF score. Dr. Koduri's patient notes did not indicate serious symptoms or a serious impairment of social or occupational functioning, except for a lone recommendation — without explanation — that Plaintiff should attend psychotherapy. (R. at 506.) Therefore, ALJ did not err when he assigned little weight to Dr. Koduri's opinions, as neither was supported by substantial evidence.

Next, Plaintiff argues that substantial evidence did not exist to support the assignment of great weight to the non-treating state agency psychologists' opinions. (Pl.'s Mem. at 13.) More specifically, Plaintiff asserts that those psychologists did not review the entire record. (Pl.'s Mem. at 13.) Dr. Entin assessed Plaintiff's Mental RFC on April 16, 2010. (R. at 79-80.) After that time, Plaintiff visited Dr. Koduri seven times and failed to visit Dr. Koduri four times. (*See* R. at 505-14.) As discussed above, these visits consisted of subjective complaints about Plaintiff's life stressors, including her relationship with her husband. (R. at 505-14.) Because the additional medical records did not indicate any new objective findings, but rather reiterated Plaintiff's subjective complaints, they could not constitute substantial evidence that contradicted the non-treating state agency opinions.

Finally, Plaintiff complains that the ALJ failed to adequately consider Dr. Brown's opinion and lists three specific opinions of Dr. Brown that allegedly were not considered: (1) Plaintiff would have difficulty performing simple and repetitive tasks due to poor attendance

20

secondary to her anxiety; (2) Plaintiff would experience difficulty managing any stress associated with competitive work; and (3) Plaintiff's work functioning was "significantly impaired." (Pl.'s Mem. at 14.) However, contrary to Plaintiff's assertions, the ALJ did consider and adopt many of Dr. Brown's opinions about Plaintiff's limitations in the RFC. More specifically, the ALJ determined that Plaintiff could only perform jobs that involved simple, routine tasks with short, simple instructions and in which little or no judgment was required; contained limited direct, face-to-face interaction with coworkers or supervisors; and required simple work-related decisions with few workplace changes. (R. at 21.)

The ALJ did not wholeheartedly adopt Dr. Brown's opinion of Plaintiff's limitations, but he did adopt many of the limitations listed by Dr. Brown. Regardless, the ALJ only assigned Dr. Brown's opinion persuasive — not great — weight and, for the reasons set forth above, substantial evidence supported the ALJ's decision. Therefore, the ALJ did not err when he assigned weight to and assessed the doctors' opinions.

**B.      Substantial evidence supported the ALJ's evaluation of Plaintiff's credibility.**

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig v. Charter*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could

produce the individual's pain or other related symptoms. *Id.*; SSR 96-7p, at 1-3. The ALJ must

consider all the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3;

*see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of

the relevant evidence in the case record") (emphasis added). If the underlying impairment

reasonably could be expected to produce the individual's pain, then the second part of the

analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence

of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at

595. The ALJ's evaluation must take into account "all the available evidence," including a

credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ

must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d

595-96; SSR 96-7p, at 5-6, 11.

Plaintiff argues that her testimony about her mental limitations was well-supported by the

record. (Pl.'s Mem. at 17.) As discussed above, Dr. Koduri's notes only reflected Plaintiff's

complaints about life stressors and her husband; they did not indicate any objective mental

limitations or observations about Plaintiff. Plaintiff also testified to having heard voices (R. at

43), but nowhere in her treatment notes was such a complaint even referenced.

Additionally, the ALJ summarized the patient notes with Dr. Koduri, which indicated that

Plaintiff frequently cried, became angry and isolated herself. (R. at 22, 200-07.) Plaintiff

testified that she lived with and cared for her eleven and twelve-year-old boys and that she and

her husband had been separated for over a year before the hearing. (R. at 21-22, 41-42.) The

ALJ also summarized Plaintiff's many emergency room visits during which Plaintiff requested

prescription narcotics and — during her last visit — tested positive for numerous controlled

substances. (R. at 23, 530-36.)

22

Finally, Plaintiff argues that the ALJ did not adequately take into account her ADLs and cites to *Bauer v. Astrue*, 532 F.3d 606, 608-09 (7th Cir. 2008). (Pl.'s Mem. at 18-19.) *Bauer* is inopposite, because the bipolar plaintiff in *Bauer* was "heavily medicated" while performing her ADLs and caring for her son. 532 F.3d at 608-09. Here, Plaintiff's treatment was conservative at best — she sporadically met with Dr. Koduri and was prescribed anti-depressants. (*See* R. at 505-14.) Throughout much of the time that she was allegedly disabled, Plaintiff cared for her children and managed her household alone, as she and her husband had separated. (*See* R. at 41-42.) The ALJ did not discount Plaintiff's ADLs, including the fact that she was the sole caregiver for her two young boys, and adequately assessed them when evaluating Plaintiff's credibility.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Court of Appeals for the Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)). Because substantial evidence supported his decision, the ALJ did not err in making the credibility evaluation.

**C.    The ALJ presented the VE with an adequate hypothetical to determine that Plaintiff was not disabled.**

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience, and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f). The Commissioner can carry his burden in the final step with the testimony of a VE. As noted earlier, when a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*

Plaintiff argues that the VE's testimony was flawed, as the ALJ presented the VE with an incomplete description of Plaintiff's mental limitations. (Pl.'s Mem. at 20.) Because the ALJ did not err in his evaluation of the medical opinion evidence and Plaintiff's credibility, the ALJ presented the VE with a hypothetical that adequately described Plaintiff's mental limitations, which was then adopted by the ALJ as Plaintiff's RFC. (*Compare* R. at 53 *with* R. at 21.) More specifically, the hypothetical addressed Plaintiff's mental limitations by requiring the VE to focus mainly on:

> unskilled work, and as the phrase is commonly understood, jobs that involve simple, routine tasks; short simple instructions; work that needs little or no judgment to do; simple duties that can be learned on the job in a short time-frame; only simple work-related decisions with few workplace changes; no direct, face-to-face interaction with the general public; no more than an occasional level face-to-face interaction with coworkers on the completion of an assigned task or duty, but this would not preclude routine face-to-face interaction on the job site; no job that demands or requires close supervision; no job that would require changing job locations during the course of the day, that is, the job is performed at the same

24

general physical location each day and does not require transit to a different job location during the course of the workday.

(R. at 53.) Because the hypothetical to the VE focused mainly on Plaintiff's mental limitations, the ALJ did not err when he presented the VE with that hypothetical.

As discussed above, substantial evidence supported the ALJ's decision that Plaintiff was not disabled. The ALJ did not err when he weighed the medical opinions, evaluated Plaintiff's credibility and adopted the hypothetical that he presented to the VE as Plaintiff's RFC. Consequently, the Court recommends that the Commissioner's decision is affirmed.

## VI. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment and motion for remand (ECF Nos. 6 & 7) be DENIED; that Defendant's motion for summary judgment (ECF No. 9) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable James R. Spencer and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: July 31, 2012